**REVERSE and RENDER in Part, and AFFIRM in Part; Opinion Filed April 29, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-01689-CV

### INWOOD NATIONAL BANK, Appellant
### V.
### WELLS FARGO BANK, N.A. AS TRUSTEE AND U.S. TRUST, BANK OF AMERICA PRIVATE WEALTH MANAGEMENT, Appellees

---

### U.S. TRUST, BANK OF AMERICA PRIVATE WEALTH MANAGEMENT, Appellant
### V.
### WELLS FARGO BANK, N.A. AS TRUSTEE AND INWOOD NATIONAL BANK, Appellees

---

### On Appeal from the 162nd Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-12-04907

## OPINION

Before Justices Bridges, Fillmore, and Brown
Opinion by Justice Fillmore

Wells Fargo Bank, N.A., as Trustee (Wells Fargo) obtained a judgment against Charles Paschall Jr. and initiated a post-judgment garnishment proceeding against U.S. Trust, Bank of America Private Wealth Management (U.S. Trust), at which Paschall held an investment account, as well as against other institutions at which Paschall maintained accounts. U.S. Trust answered, asserting that, although it held assets belonging to Paschall, those assets were pledged as collateral for a debt he owed to Inwood National Bank (Inwood). Inwood filed a plea in intervention, contending it held a perfected security interest in the assets in the investment

account, and a motion to dissolve the writ of garnishment as to those assets. The trial court denied Inwood's motion and rendered judgment awarding Wells Fargo the assets in the investment account. The trial court also ordered that U.S. Trust recover its costs in the garnishment proceeding, consisting of attorney's fees U.S. Trust incurred in the garnishment proceeding, from the assets in the investment account, but did not award U.S. Trust contingent attorney's fees on appeal.

In this appeal, Inwood asserts the trial court erred by denying its motion to dissolve the writ of garnishment, while U.S. Trust argues the trial court erred by failing to award contingent attorney's fees on appeal. We conclude the trial court did not err by failing to award U.S. Trust contingent attorney's fees on appeal. However, because Inwood's security interest has priority over Wells Fargo's judgment lien, we reverse the trial court's judgment awarding Wells Fargo the assets in the investment account. We render judgment dissolving the writ of garnishment as to the investment account and ordering that U.S. Trust recover its costs, consisting of attorney's fees incurred during the proceedings in the trial court, from Wells Fargo. In all other respects, the trial court's judgment is affirmed.

**Background**

In February 2000, Paschall borrowed money from Inwood and, to secure payment on the loan, granted Inwood a security interest in the assets in an investment account at U.S. Trust. Inwood filed a Financing Statement with the Texas Secretary of State on February 18, 2000, perfecting its security interest in the investment account.[1] On May 10, 2009, Paschall and Inwood signed a new promissory note in the principal amount of $655,223.46 (the 2009 Note), which matured on August 10, 2009. The 2009 Note stated it was given in renewal and extension,

---

[1] Although the February 2000 loan documents are not in the reporter's record, Inwood's February 18, 2000 Financing Statement is included in the record on appeal.

–2–

and not in novation, of the previous loan. Inwood also specifically reserved the right to "renew or extend (repeatedly and for any length of time) this loan." In connection with the 2009 Note, Inwood and Paschall executed a security agreement and a commercial pledge agreement granting Inwood a security interest in the assets held in the investment account. The security agreement stated it would "continue in effect even though all or any part of the Indebetedness is paid," and would cover not only the 2009 Note, but also "all renewals of, extensions of, refinancings of, consolidations of, and substitutions for" the 2009 Note. It also provided that it secured all future advances made by Inwood to Paschall regardless of whether the advances were made pursuant to a commitment or for the same purposes. A Financing Statement amendment filed by Inwood with the Texas Secretary of State on October 5, 2009, stated it was a continuation, with no change, of the security interest in the assets in the investment account.

On August 10, 2009, Paschall and Inwood signed a promissory note renewing and extending the 2009 Note until February 10, 2010. Between February 10, 2010 and February 11, 2012, Inwood and Paschall extended the maturity of the loan six more times through promissory notes ranging in duration from three to six months. On February 11, 2012, Inwood and Paschall executed a promissory note extending the payment date until August 11, 2012. Each of the promissory notes executed by Inwood and Paschall from May 9, 2009, through February 11, 2012, stated it was "given in renewal and extension and not in novation" of the indebtedness.

Wells Fargo obtained a judgment against Paschall for $2,178,251.41 on May 31, 2011. It subsequently applied for a post-judgment writ of garnishment as to the assets in the investment account, as well as the assets in accounts maintained by Paschall at Dilley State Bank, Bank of America, N.A., and Veritex Community Bank. All garnishees other than U.S. Trust entered into interlocutory agreed judgments with Wells Fargo pertaining to the assets held in Paschall's

accounts. U.S. Trust answered and admitted it held assets belonging to Paschall, but asserted Inwood had a security interest in those assets.

Inwood intervened on May 18, 2012, and filed a motion to dissolve, vacate, or modify the writ of garnishment as to the assets in the investment account. The February 11, 2012 promissory note between Inwood and Paschall matured on August 11, 2012, with a principal amount due of $372,920.45. Inwood and Paschall signed a new promissory note on August 11, 2012 (the 2012 Note), which stated it was given in renewal and extension, but not in novation, of the February 11, 2012 promissory note. The maturity date of the 2012 Note was February 11, 2013. After the 2012 Note, Inwood and Paschall continued to periodically renew and extend the loan, memorialized by new promissory notes.

At the hearing on Inwood's motion, the parties agreed the issue presented to the trial court was whether, pursuant to section 9.323(b) of the business and commerce code, Inwood made an advance to Paschall by executing the 2012 Note that caused its security interest in the assets in the investment account to become subordinate to Wells Fargo's judgment lien. The evidence and the stipulations of the parties at the hearing established Inwood had not advanced any new funds to Paschall under the loan secured by the assets in the investment account since 2009. In addition to the loan that was secured by the assets in the investment account, Paschall, or one of his "various entities," had "a number" of other loans with Inwood. Although the record contains no information on when these loans were made, the original principal amount of any loan, the terms of any loan, or the borrower on any loan, it does reflect that, at the time of the hearing, these loans included a $300,000 home equity loan, a $15,000 loan for a condominium, and a "number of lot development loans for a development near Argyle." Gordon Seaberry, a senior vice-president of Inwood, testified the bank "kept the maturity dates the same to address both [the Argyle loans and the loan at issue in this case] at the same time" and used the loan at

–4–

issue in this case as leverage to "get [Paschall] to pay off the Argyle debt." According to Seaberry, at the time Wells Fargo sought to garnish the assets in the investment account, the lot development loans had not been paid in full, but were paid in full shortly before the hearing. At the time of the hearing, Paschall was current on his obligations on the home equity loan, the condominium loan, and the loan at issue in this case.

The trial court denied Inwood's motion, and Wells Fargo filed a motion for judgment. At the hearing on Wells Fargo's motion, U.S. Trust presented evidence it had incurred reasonable and necessary attorney's fees of $32,837.30 through the date of the hearing on Wells Fargo's motion. U.S. Trust's counsel also opined that U.S. Trust would incur reasonable and necessary contingent attorney's fees on appeal in specific amounts for an appeal to this Court and to the Texas Supreme Court. The trial court rendered final judgment that Wells Fargo recover from U.S. Trust the cash in the investment account; the shares of stock in the investment account be sold under execution for the benefit of Wells Fargo; the costs incurred in connection with the execution be paid from the sale proceeds; and U.S. Trust recover $32,837.30 as reasonable and necessary attorney's fees from Paschall's property held by U.S. Trust. The trial court also incorporated the interlocutory agreed judgments against the other garnishees into the final judgment.

The trial court made findings of fact and conclusions of law and amended findings of fact and conclusions of law. As relevant to this appeal, the trial court found Paschall had been a customer of Inwood for at least five years prior to Wells Fargo filing the garnishment action; Paschall had a number of loans with Inwood unrelated to the 2012 Note, including lot development loans, a $300,000 home equity loan, and a condominium loan; Inwood was aware of financial problems that prevented Paschall from timely paying his obligations to Inwood; under the 2012 Note, Inwood had the right to declare an event of default and demand full

payment when Wells Fargo filed the garnishment action, but chose not to do so; Inwood benefitted from its decision not to declare a default under the February 11, 2012 promissory note because it received payments from Paschall on unrelated debts owed to Inwood, which allowed Inwood to reduce its overall exposure to the effect of a global default by Paschall; and although Inwood did not advance new funds to Paschall in connection with the 2012 Note, it did advance new credit to Paschall. The trial court found and concluded the 2012 Note was an advance made more than forty-five days after Wells Fargo became a lien creditor. The trial court found Inwood had knowledge of Wells Fargo's judgment lien when it and Paschall signed the 2012 Note, and the 2012 Note was not made pursuant to a commitment entered into without knowledge of the judgment lien. The trial court found and concluded the "future advances" provision in the security agreement between Inwood and Paschall was not a loan commitment and did not obligate Inwood to advance credit to Paschall through the 2012 Note. The trial court concluded Inwood obtained a properly perfected security interest in the assets of the investment account prior to Wells Fargo's judgment lien but, pursuant to section 9.323(b) of the business and commerce code, Wells Fargo's judgment was superior to the security interest of Inwood. As to U.S. Trust, the trial court found U.S. Trust presented insufficient evidence at the hearing to show entitlement to additional costs in the form of contingent attorney's fees on appeal and, alternatively, concluded U.S. Trust was not entitled to such fees as a matter of law. Both Inwood and U.S. Trust appealed the trial court's judgment.[2]

## Inwood's Appeal

In one issue, Inwood, challenging both the trial court's interpretation of section 9.323(b) of the business and commerce code and its findings of fact and conclusions of law, asserts the trial court erred by finding and concluding the 2012 Note was an advance that caused Inwood's

---

[2] We consolidated U.S. Trust's appeal into this appeal.

security interest in the assets in the investment account to be subordinated to Wells Fargo's judgment lien.

*Standard of Review*

Statutory interpretation is a question of law that we review de novo. *City of Houston v. Bates*, 406 S.W.3d 539, 543 (Tex. 2013); *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). Our primary objective is to ascertain and give effect to the intent of the Legislature when it enacted the statute. *Bates*, 406 S.W.3d at 543. When a statute is clear and unambiguous, we presume the words chosen are "'the surest guide to legislative intent.'" *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)). We apply the statute's words according to their common meaning in a way that gives effect to every word, clause, and sentence. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008); *see also* TEX. GOV'T CODE ANN. § 311.011(a) (West 2013) (requiring that words be "construed according to the rules of grammar and common usage"); *Bates*, 406 S.W.3d at 543–44. When statutory text is clear, it is determinative of legislative intent, "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011); *see also Bates*, 406 S.W.3d at 543.

The trial court's findings of fact following a bench trial have the same weight as a jury verdict upon questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We review the trial court's findings for legal and factual sufficiency of the evidence under the same standards as are applied to review of jury verdicts. *Id.* In conducting a legal sufficiency review, we must determine whether the evidence would enable the factfinder to reach the determination under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will not disturb a finding for factual insufficiency unless the finding is so against the great weight

and preponderance of the evidence that it is clearly wrong and manifestly unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014). However, the trial court has no discretion in determining what the law is or applying the law to the facts. *Id.* Accordingly, we review the trial court's conclusions of law de novo. *Id.*; *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We will uphold the trial court's judgment, even if we determine a conclusion of law is erroneous, if the judgment can be sustained on any legal theory supported by the evidence. *Marchand*, 83 S.W.3d at 794.

*Analysis*

The Texas Business and Commerce Code, which contains Texas's version of the Uniform Commercial Code (UCC),[3] provides that a perfected security interest in property generally has priority over all other claims to the property. *See* TEX. BUS. & COM. CODE ANN. § 9.201(a) & cmt. 2 (West 2011); *ATC Healthcare Servs., Inc. v. New Century Fin., Inc.*, No. 01-10-00940-CV, 2011 WL 2739540, at *4 (Tex. App.—Houston [1st Dist.] July 14, 2011, no pet.) (mem. op.). The parties to a loan may structure a security agreement to provide that the security interest in the collateral will cover not only funds advanced at the time of the original loan, but also future advances to the debtor. TEX. BUS. & COM. CODE ANN. § 9.204(c); *Wagner v. Compass Bank*, 170 S.W.3d 220, 224 (Tex. App.—Dallas 2005, no pet.). Pursuant to such an agreement, the lender's subsequent advances to the debtor attach to the collateral and enlarge the original security interest in the collateral. *See* TEX. BUS. & COM. CODE ANN. § 9.323(a) & cmts. 3, 4.

---

[3] *See* TEX. BUS. & COM. CODE ANN. § 1.101(a) (West 2009) ("This title may be cited as the Uniform Commercial Code.").

A judgment lien, such as the one held by Wells Fargo, is generally subordinate to a perfected security interest in the collateral. *See id.* § 9.317(a)(2)(A) (lien creditors are subordinate to prior perfected security interest). However, section 9.323(b) of the Texas UCC sets out a narrow exception to the priority of claims in order to protect a judgment lien creditor's right to property subject to a perfected security interest:

> Except as otherwise provided in Subsection (c),[4] a security interest is subordinate to the rights of a person that becomes a lien creditor to the extent that the security interest secures an advance made more than 45 days after the person becomes a lien creditor unless the advance is made:
>
> (1) without knowledge of the lien; or
>
> (2) pursuant to a commitment entered into without knowledge of the lien.

TEX. BUS. & COM. CODE ANN. § 9.323(b) (footnote added).[5] The purpose of section 9.323(b) is to protect a judgment lien creditor who has successfully levied on a valuable equity subject to a security interest from being "squeezed out" by a later enlargement of the security interest by an additional advance. UNIFORM COMMERCIAL CODE, 1972 Official Text Showing Changes Made in Former Text of Article 9, Secured Transactions, and of Related Sections and Reasons for Changes, Appendix B, § 9-312(5) (discussing predecessor statute); *see also Spector United Emp. Credit Union v. Smith*, 263 S.E.2d 319, 321 (N.C. Ct. App. 1980) (discussing purpose of changes to UCC, including addition of provision at issue in this case).

In this case, it is undisputed that Inwood had a perfected security interest in the assets in the investment account at the time Wells Fargo obtained its judgment lien and that Inwood's security interest had priority over Wells Fargo's judgment lien. It is also undisputed that Inwood and Paschall signed the 2012 Note more than forty-five days after Inwood had notice of Wells

---

[4] Subsection (c) of 9.323 relates to a security interest held by a secured party that is a buyer of accounts, chattel paper, payment intangibles, or promissory notes or a consignor and is not applicable in this case. *See* TEX. BUS. & COM. CODE ANN. § 9.323(c).

[5] Section 9.323 of the business and commerce code is identical to section 9-323 of the UCC. *See* TEX. BUS. & COM. CODE ANN. § 9.323 & accompanying historical notes.

Fargo's judgment lien. Further, Inwood does not argue that it had a commitment, entered into without knowledge of Wells Fargo's judgment lien, to make an advance to Paschall. Therefore, whether the trial court properly determined Inwood's security interest became subordinate to Wells Fargo's judgment lien hinges on whether the 2012 Note was an "advance."

Because neither section 9.323(b) nor any other section of the Texas UCC defines the term "advance," we look first to the common meaning of the term in determining the Legislature's intent. *First Am. Title Ins. Co.*, 258 S.W.3d at 631. The term "advance" means "the furnishing of money or goods before any consideration is received in return," or "the money or goods furnished." BLACK'S LAW DICTIONARY 63 (10th ed. 2010); *see also Dick Warner Cargo Handling Corp. v. Aetna Bus. Credit, Inc.*, 746 F.2d 126, 130 (2d Cir. 1984) ("'[A]dvances' are sums put at the disposal of the borrower[.]" (interpreting section of New York UCC analogous to section 9.323(b))). This definition is consistent with the statute's purpose of preventing a secured party from increasing its interest in the collateral, thereby preventing a judgment lien creditor from levying on any equity in the property in excess of the security interest.

Although Inwood provided no new funds, or access to new funds, to Paschall in connection with the 2012 Note that would have placed an additional burden on the collateral in the investment account, Wells Fargo, relying on *UNI Imports, Inc. v. Aparacor, Inc.*, 978 F.2d 984 (7th Cir. 1991), asserts the 2012 Note was an advance under section 9.323(b) because it constituted an extension of credit to Paschall in the form of a new note. In *UNI Imports, Inc.*, Exchange National Bank (Exchange) and Aparacor, Inc. executed a security agreement granting Exchange a security interest in Aparacor's assets at Exchange. *Id.* at 985. On October 9, 1987, Exchange and Aparacor executed a note due April 30, 1988, which incorporated the security agreement and established a revolving line of credit for Aparacor and related entities. *Id.* After

–10–

the note expired, Exchange continued to make advances of funds without an additional written agreement. *Id.*

UNI Imports, Inc. (UNI) obtained a judgment against Aparacor on November 18, 1988, and attempted to execute on Aparacor's assets at Exchange on January 12, 1989. *Id.* at 985–86. Exchange refused to turn over any of Aparacor's assets in its possession, contending it had priority status. *Id.* at 986. Exchange continued to advance money to Aparacor. *Id.*

On February 3, 1989, Exchange and Aparacor executed a modification note that purported to modify the October 1987 note and reduced the amount available to Aparacor on the line of credit. *Id.* By February 26, 1989 (forty-five days after Exchange had been served with the writ of execution), the balance Aparacor owed on the loan had grown significantly. *Id.* Between February 26, 1989 and March 2, 1989, Exchange advanced an additional $274,000 to Aparacor. *Id.* After Aparacor executed an assignment for the benefit of creditors on March 2, 1989, UNI sought a turnover of Aparacor's assets in Exchange's possession. *Id.*

The relevant issue before the Seventh Circuit was whether, under the Illinois UCC, UNI's judgment lien had priority over Exchange's security interest in Aparacor's assets. *Id.* at 985.[6] Exchange specifically argued the funds provided to Aparacor before the assignment for the benefit of creditors were advances made pursuant to binding commitments in the original loan agreement, as modified and revived by the modification agreement. *Id.* at 988. Exchange claimed those advances, therefore, had priority over UNI's judgment lien under the exception in the statute for advances made "pursuant to a commitment entered into without knowledge of the

---

[6] Under the provision of the Illinois UCC at issue in *UNI Imports, Inc.*:

> future advances are protected (1) in all cases for 45 days following attachment of the lien; (2) beyond 45 days if the secured party makes the advance without knowledge of the lien; and (3) beyond 45 days if the secured party is committed to make advances, provided the commitment was entered into without knowledge of the lien.

*UNI Imports, Inc.*, 978 F.2d at 987–88. The provision is currently codified at 810 ILL. COMP. STAT. 5/9-323 (Westlaw through P.A. 98-1175 of 2014 Reg. Sess. and through P.A. 99-2 of 2015 Reg. Sess.).

–11–

lien." *Id.* Exchange also argued the payments it made after Aparacor executed the assignment for the benefit of creditors were "non-advances" that had priority over UNI's judgment lien. *Id.*

The *UNI Imports, Inc.* opinion did not address the meaning of the word "advance" under the UCC. Rather, the issue was whether Exchange had a binding commitment to advance funds to Aparacor after it acquired knowledge of UNI's judgment lien. As relevant to Wells Fargo's argument in this appeal, the court noted Exchange had failed to explain how it could have retained a binding commitment to advance funds to Aparacor pursuant to a matured note. *Id.* at 989. It then determined the district court was "well justified in finding that the modification note was a new commitment entered into by Exchange with full knowledge of UNI's intervening lien, and that the parties had not succeeded in reviving the original, expired note by their execution of the modification note." *Id.*

The modification note significantly reduced the amount of credit available to Aparacor. Further, almost immediately after the parties executed the modification note, Aparacor's indebtedness to Exchange increased substantially. Therefore, there was evidentiary support for the district court's finding the parties intended to enter into a new loan agreement pursuant to which Exchange advanced funds to Aparacor that increased Exchange's security interest in the collateral and the funds were not advanced pursuant to a commitment in the October 9, 1987 note.

It has long been the law in Texas that the giving of a new note for a debt evidenced by a former note does not extinguish the old note unless it was the intention of the parties to do so. *Schwab v. Schlumberger Well Surveying Corp.*, 198 S.W.2d 79, 82 (Tex. 1946); *Chapman v. Crichet*, 95 S.W.2d 360, 363 (Tex. 1936). The adoption of the Texas UCC did not change this rule. *See Bank of Austin v. Barnett*, 549 S.W.2d 428, 430 (Tex. Civ. App.—Austin 1977, no writ); *see also Thompson v. Chrysler First Bus. Credit Corp.*, 840 S.W.2d 25, 29 (Tex. App.—

Dallas 1992, no writ) (in case decided after adoption of Texas UCC, this Court stated, "unless it is proved that the parties intended to discharge the obligations under the existing note prior to renewal or extension, there is no discharge of the old note by the executing of an extension agreement"); *Villarreal v. Laredo Nat'l Bank*, 677 S.W.2d 600, 607 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). An intention by the parties to enter into the novation of a debt is never presumed, and the burden of proving discharge or novation is on the party asserting it. *Barnett*, 549 S.W.2d at 430. "In general, the renewal merely operates as an extension of time in which to pay the original indebtedness. The debt is not thereby increased. It remains the same; it is in substance and in fact the same indebtedness evidenced by a new promise." *Id.*

Inwood and Paschall entered into the loan secured by the collateral in the investment account in 2000. The record establishes that, beginning in May 2009 and continuing at least through the hearing on Inwood's motion, Inwood and Paschall entered into a series of promissory notes extending the time to pay the indebtedness. Each of these promissory notes appears identical to the others and specifically states it was a renewal and extension of the indebtedness, and not a novation. None of the promissory notes increased the amount of the indebtedness or the burden on the collateral. The balance owed on the note, or the amount of credit available to Paschall, was exactly the same before and after the execution of the 2012 Note. There is no evidence that Inwood and Paschall intended, through the 2012 Note, to novate the loan agreement to provide new credit to Paschall. Nothing about the 2012 Note, standing alone, placed an additional burden on the collateral in the investment account such that it would constitute an advance under section 9.323(b). *See Smith*, 263 S.E.2d at 435 (unfairness from

–13–

squeeze out should not "normally result to a subsequent purchaser from a transaction which merely extends or continues the secured obligation without enlarging it").[7]

Wells Fargo next argues, based on *Boers v. Payline Systems, Inc.*, 928 P.2d 1010 (Or. App. 1996), that the term "advance" in section 9.323(b) should be read broadly to encompass things other than money. In *Boers*, a judgment debtor gave a law firm a security interest in his accounts at several brokerages to secure payment of appellate legal fees. *Id.* at 1011. The judgment debtor did not stay enforcement of the judgment during appeal, and the judgment creditor sought to garnish the brokerage accounts, thereby becoming a lien creditor under Oregon law. *Id.* The law firm asserted it had a perfected security interest in the assets in the accounts that had priority over the lien created by the garnishment. *Id.* The question before the Oregon Court of Appeals was whether the law firm, by virtue of its security interest, had priority over assets in the accounts with respect to legal services rendered to the judgment debtor after service of the garnishment. The court concluded the term "advance" under the Oregon UCC should be read broadly to include value other than money. *Id.* at 1013.[8] The court also concluded the law firm's legal services constituted an advance provided pursuant to a commitment to the judgment

---

[7] The *Smith* court was addressing section 25-9-307(3) of the Georgia UCC, which, at the time, stated:

> A buyer other than a buyer in ordinary course of business (subsection (1) of this section) takes free of a security interest to the extent that it secures future advances made after the secured party acquires knowledge of the purchase, or more than 45 days after the purchase, which ever first occurs, unless made pursuant to a commitment entered into without knowledge of the purchase and before the expiration of the 45-day period.

*Smith*, 263 S.E.2d at 433. This provision is now codified at GA. CODE ANN. § 11-9-323(c) (Westlaw through Acts 2 to 20 of 2015 Legis. Sess.). The Texas UCC contains a similar provision in section 9.323(d) of the business and commerce code. *See* TEX. BUS. & COM. CODE ANN. § 9.323(d).

[8] The *Boers* court was addressing section 79.3010(4) of the Oregon UCC, which, at the time, stated:

> A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures *advances* made before the person becomes a lien creditor or within 45 days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.

*Boers*, 928 P.2d at 1012. This provision is now codified at OR. REV. STAT. ANN. § 79.0323 (Westlaw through ch. 22 of 2015 Reg. Sess.). The current provision is substantively identical to section 9.323(b) of the Texas Business and Commerce Code.

debtor predating the lien created by the garnishment and, therefore, the law firm's security interest had priority over the lien. *Id.*

Wells Fargo argues the 2012 Note was an extension of credit that provided other value and should, therefore, qualify as an advance under section 9.323(b). However, we are not confronted with a situation in which Inwood, without actually advancing new funds to Paschall, either provided a mechanism under which Paschall could potentially draw new funds or provided new services to Paschall. Rather, the 2012 Note continued Inwood's and Paschall's practice over a number of years of periodically renewing the note and extending the payment date. Wells Fargo has identified no "other value," such as the legal services in *Boers*, that could constitute an advance under the 2012 Note. Even applying the arguably broader definition in *Boers*, we cannot conclude the trial court properly determined the 2012 Note was an advance under section 9.323(b).

Finally, Wells Fargo contends the public policy underlying section 9.323(b), as well as equity, support the trial court's determination that Inwood's security interest is subordinate to Wells Fargo's judgment lien. Wells Fargo points out that Inwood chose to extend the loan evidenced by the 2012 Note, rather than declare a default and foreclose on the collateral, in order "to insulate itself from the effects of a global default by Paschall." Wells Fargo argues section 9.323(b) was enacted to prevent collusion between a lender and a debtor that prevents a judgment lien creditor from obtaining access to the debtor's assets and, therefore, both this policy and equity require that Wells Fargo's judgment lien have priority over Inwood's security interest.

We have found no authority addressing the question of whether an action by a lender, such as executing a renewal note, which, standing alone, is not an "advance" under section 9.323(b), is made an "advance" by other dealings between the lender and the debtor. However,

we need not answer that question in this case because the evidence does not support such a scenario. There is no evidence that Paschall, as opposed to one of his "various entities," was the debtor on any other loan from Inwood or whether the assets available to pay those loans belonged to Paschall, as opposed to one of his "various entities." If the assets used to pay those other loans belonged to Paschall, Wells Fargo would have had the ability to seek to garnish those assets, just as it attempted to garnish the assets in the investment account. Nothing about the 2012 Note "squeezed out" Wells Fargo from imposing a judicial lien on Paschall's assets outside the investment account. Conversely, if the assets used to pay the other loans belonged to one of Paschall's "various entities," Wells Fargo did not have a right, under the judgment lien at issue, to garnish those assets, and there is no evidence Paschall could use assets belonging to his "various entities" to repay the loan at issue in this case. Regardless, Wells Fargo was in the same position before the execution of the 2012 Note as it was after its execution and was not subject to the "squeeze out" section 9.323(b) seeks to address.

*Conclusion*

The fundamental purposes of the Texas UCC are to "simplify, clarify and modernize the law governing commercial transactions," permit the "continued expansion of commercial practices through custom, usage, and agreement of the parties," and make the law among jurisdictions uniform. TEX. BUS. & COM. CODE ANN. § 1.103(a) (West 2009); *see also Sw. Bank v. Info Support Concepts, Inc.*, 149 S.W.3d 104, 110 (Tex. 2004). None of these purposes are met by construing the term "advance" in section 9.323(b) to include a promissory note that the parties to an ongoing commercial relationship intended to be solely a renewal and extension of an existing indebtedness and that did not place any additional burden on the collateral securing the loan. Indeed, such a construction would materially impact the priority of interests carefully established by the UCC.

We conclude the trial court erred by determining the 2012 Note was an advance under section 9.323(b) of the business and commerce code. Accordingly, Inwood's perfected security interest in the assets in the investment account had priority over Wells Fargo's judgment lien in the same property, and the trial court erred by denying Inwood's motion to dissolve the writ of garnishment as to the assets in the investment account. We resolve Inwood's sole issue in its favor; reverse the trial court's judgment in part; and render judgment that Inwood's motion to dissolve Wells Fargo's writ of garnishment as to the assets in the investment account is granted. *See* TEX. R. APP. P. 43.2(c).

### U.S. Trust's Appeal

In one issue, U.S. Trust asserts the trial court erred by failing to award contingent attorney's fees on appeal as part of U.S. Trust's costs in the garnishment proceeding. Whether U.S. Trust may recover attorney's fees in connection with its participation in a garnishment proceeding is a question of law, to which we apply a de novo standard of review. *Spector Gadon & Rosen, P.C. v. Sw. Sec., Inc.*, 372 S.W.3d 244, 248 (Tex. App.—Dallas 2012, no pet.). However, we review the trial court's decision to grant or deny attorney's fees for an abuse of discretion. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004); *Spector Gadon & Rosen, P.C.*, 372 S.W.3d at 251 ("The fixing of a reasonable attorney's fee is a matter within the sound discretion of the trial court, and its judgment will not be reversed on appeal absent a clear abuse of discretion."). Legal and factual sufficiency of the evidence are not independent grounds under this standard of review, but are relevant factors we may consider in assessing whether the trial court abused its discretion. *Spector Gadon & Rosen, P.C.*, 372 S.W.3d at 251.

Garnishment is a statutory proceeding brought by a judgment creditor that allows the property, money, or credits of a debtor in the possession of another to be applied to the payment

of a debt.  TEX. CIV. PRAC. & REM. CODE ANN. §§ 63.001–.008 (West 2008); TEX. R. CIV. P.

657–79; *Beggs v. Fite*, 106 S.W.2d 1039, 1042 (Tex. 1930).  Texas Rule of Civil Procedure 677,

which governs cost allocation in garnishment proceedings, provides:

> Where the garnishee is discharged upon his answer, the costs of the proceeding, including a reasonable compensation to the garnishee, shall be taxed against the plaintiff; where the answer of the garnishee has not been controverted and the garnishee is held thereon, such costs shall be taxed against the defendant and included in the execution provided for in this section; where the answer is contested, the costs shall abide the issue of such contest.

TEX. R. CIV. P. 677.  "'Costs' under rule 677 include attorney's fees."  *Spector Gadon & Rosen,*

*P.C.*, 373 S.W.3d at 248; *see also Sorenson v. City Nat'l Bank*, 49 S.W.2d 718, 722 (Tex. 1932)

(citing virtually identical predecessor to rule 677; the allowance of "reasonable compensation" to

discharged garnishee includes reasonable attorney's fees).

No party to this appeal has challenged either the trial court's award of attorney's fees to

U.S. Trust as costs under rule 677 or the amount of fees awarded to U.S. Trust.  The only issue in

this appeal pertaining to the award of attorney's fees to U.S. Trust is its complaint the trial court

erred by failing to award contingent attorney's fees on appeal.

The issue presented in the trial court was whether Inwood's security interest or Wells

Fargo's judgment lien had priority as to the assets in the investment account.  U.S. Trust was not

substantively involved in this issue in the trial court and presented no evidence that it would be

involved in the appeal of the trial court's ruling on this issue.  The trial court reasonably could

have concluded, based on the evidence before it, that U.S. Trust would have no need to be

involved in any appeal of the trial court's decision and, therefore, it was not necessary for U.S.

Trust to incur any appellate attorney's fees.  In light of the substantive issue presented to the trial

court for decision and the issue presented by Inwood in its appeal, we cannot conclude the trial

court abused its discretion in doing so.  *See Gill v. Oak Cliff Bank & Trust Co.*, 331 S.W.2d 832,

834 (Tex. Civ. App.—Amarillo 1950, no writ). We resolve U.S. Trust's sole issue against it. We deny Wells Fargo's request that U.S. Trust be sanctioned for filing a frivolous appeal.

**Conclusion**

We reverse the trial court's judgment, in part, and render judgment granting Inwood's motion to dissolve the writ of garnishment as to the assets in the investment account. Because the writ of garnishment as to the assets in the investment account is dissolved, costs are no longer appropriately assessed against Paschall. *See* TEX. R. CIV. P. 677. Accordingly, we also reverse the trial court's judgment ordering that U.S. Trust recover $32,837.30 in reasonable and necessary attorney's fees from Paschall's property being held by U.S. Trust.

U.S. Trust is now being effectively discharged on its answer, and rule 677 requires its costs be assessed against Wells Fargo. *See* TEX. R. CIV. P. 677. Accordingly, we render judgment that U.S. Trust recover its costs of $32,837.30, reflecting reasonable and necessary attorney's fees incurred through the hearing on Wells Fargo's motion for judgment, as determined by the trial court, from Wells Fargo. *See id.*; TEX. R. APP. P. 43.2(c) (appellate court may reverse trial court's judgment in whole or in part and render judgment trial court should have rendered).

In all other respects, the trial court's judgment is affirmed.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

131689F.P05

–19–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

INWOOD NATIONAL BANK, Appellant

No. 05-13-01689-CV          V.

WELLS FARGO BANK, N.A. AS
TRUSTEE AND U.S. TRUST BANK,
BANK OF AMERICA PRIVATE
WEALTH MANAGEMENT, Appellees

U.S. TRUST BANK, BANK OF AMERICA
PRIVATE WEALTH MANAGEMENT,
Appellant
                              V.

WELLS FARGO BANK, N.A., AS
TRUSTEE AND INWOOD NATIONAL
BANK, Appellees

On Appeal from the 162nd Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. DC-12-04907.
Opinion delivered by Justice Fillmore,
Justices Bridges and Brown participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED**, in part, and judgment is **RENDERED** that:

Inwood National Bank's motion to dissolve Wells Fargo Bank, N.A., as Trustee's writ of garnishment as to account 30-01-100-0040915 at U.S. Trust, Bank of America Private Wealth Management is **GRANTED**; Wells Fargo Bank, N.A., as Trustee's writ of garnishment as to that account is **DISSOLVED**; and Wells Fargo Bank, N.A., as Trustee's Post-Judgment Writ of Garnishment as to that account is **DISMISSED** with prejudice.

Further, in accordance with this Court's opinion of this date, the judgment of the trial court that U.S. Trust Bank, Bank of America Private Wealth Management recover its costs in the garnishment proceeding of $32,837.30 from the assets held in account 30-01-100-0040915 at

–20–

U.S. Trust Bank, Bank of America Private Wealth Management is **REVERSED** and judgment is **RENDERED** that U.S. Trust Bank, Bank of America Private Wealth Management recover its costs in the garnishment proceeding of $32,837.30 from Wells Fargo Bank, N.A., as Trustee.

In all other respects, the trial court's judgment is **AFFIRMED**.

As to the appeal brought by Inwood National Bank, it is **ORDERED** that Inwood National Bank recover its costs of this appeal from Wells Fargo Bank, N.A., as Trustee. As to the appeal brought by U.S. Trust Bank, Bank of America Private Wealth Management, it is **ORDERED** that the parties bear their own costs of appeal.

The clerk of the Dallas County court is directed to release the cash deposit in the registry of the court to Inwood National Bank.

Judgment entered this 29th day of April, 2015.